## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KENNETH COLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01838-TWP-DML |
| | ) | |
| NADIR AL-SHAMI, M.D., in his individual | ) | |
| capacity, and ADVANCED CORRECTIONAL | ) | |
| HEALTH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants Nadir Al-Shami, M.D.'s ("Dr. Al-Shami")

and Advanced Correctional Health, Inc.'s ("ACH") (collectively, "the Defendants") Motion for

Summary Judgment (Filing No. 81).  Following his arrest on August 12, 2012, and subsequent

incarceration, Plaintiff Kenneth Collins ("Mr. Collins") experienced alcohol withdrawal and

delirium tremens ("DTs") while detained in the Jackson County Jail (the "Jail").  Mr. Collins

asserts that he suffered injuries as a result of inadequate medical care for his DTs.  Mr. Collins

initiated this lawsuit, asserting a claim under 42 U.S.C. § 1983 for violation of the Fourth and

Fourteenth Amendments and a state law claim for medical negligence.  The Defendants moved for

summary judgment, asserting that they were not deliberately indifferent or objectively

unreasonable in providing medical care to Mr. Collins while he was in custody.  For the following

reasons, the Defendants' Motion for Summary Judgment is **GRANTED**.

## I.  BACKGROUND

In the afternoon or early evening of August 12, 2012, Mr. Collins was arrested by a

Seymour Police Department law enforcement officer for operating while intoxicated.  His blood

alcohol level registered at 0.29%.  Law enforcement officers transported Mr. Collins to the Jail where he was incarcerated and Sergeant Joe Barnes ("Sgt. Barnes") processed Mr. Collins into the jail log.  Sgt. Barnes noted that Mr. Collins reported he had experienced DTs in the past and that Mr. Collins had his own bottle of prescription Librium with him to treat any alcohol withdrawal or DTs (Filing No. 87-8).  On August 12, 2012, Sgt. Barnes called Dr. Al-Shami to discuss Mr. Collins and his Librium, and Dr. Al-Shami approved Mr. Collins's use of the Librium in accordance with the dosage on the bottle.  *Id.*  Mr. Collins was placed in holding cell number four so that officers could observe him for any DTs.  *Id.*

During Mr. Collins's incarceration at the Jail, Dr. Al-Shami—an employee of ACH, which contracted with the Jackson County Sheriff to provide medical services at the Jail—was responsible for Mr. Collins's medical care (Filing No. 83-1 at 1).  Nurse Amber Easterday ("Nurse Easterday") and Nurse LeeAnn Wheeler ("Nurse Wheeler"), employees of the Jail, also were responsible for his medical care.  When Dr. Al-Shami, Nurse Easterday, and Nurse Wheeler were not available at the Jail, law enforcement officers were responsible for Mr. Collins's medical observation and care.  Dr. Al-Shami visited the Jail one day a week to see inmates, and otherwise, he was on-call twenty-four hours a day, seven days a week.

Dr. Al-Shami was the primary care physician for each of the inmates at the Jail; therefore, the inmates became his patients.  Dr. Al-Shami has extensive experience treating inmates for drug or alcohol withdrawal and detoxification. Dr. Al-Shami prescribed medication that he deemed medically necessary for his inmate patients; however, after prescribing a medication, he was not involved in dispensing the medication to the inmates.  The jail nursing staff or jail officers administered the medications to the inmates (Filing No. 83-1 at 1–2).

Dr. Al-Shami first learned that Mr. Collins was incarcerated at the Jail and may need treatment for alcohol withdrawal or DTs when Sgt. Barnes called him on August 12, 2012. Dr. Al-Shami approved Mr. Collins's use of his personal prescription of Librium (Filing No. 83-1 at 2–3). On August 12, 2012, at 7:00 p.m., an officer noted that he was starting a record log and placed Mr. Collins in a cell. He also noted that Mr. Collins was responsive (Filing No. 83-2 at 50). At 7:30 p.m., an officer noted that Mr. Collins was responsive, had no complaints, and that he gave Mr. Collins his glasses. *Id.* From 9:00 p.m. to 11:30 p.m., an officer observed Mr. Collins every fifteen minutes and each time noted that Mr. Collins was laying down. *Id.* at 51.

On August 13, 2012, from midnight to 2:15 a.m., an officer observed Mr. Collins every fifteen minutes and each time noted that he was laying down (Filing No. 83-2 at 51). At 6:30 a.m., an officer noted that Mr. Collins was responsive, had no complaints, and was eating breakfast. *Id.* at 50. At 7:00 a.m. and 7:15 a.m., an officer observed Mr. Collins and noted that he was laying down each time. *Id.* at 51. At 8:00 a.m., Nurse Wheeler logged in Mr. Collins's personal prescription of Librium and noted that the prescription was dated April 7, 2012, and was part of an alcohol protocol. *Id.* at 49. Nurse Wheeler also noted that she locked eighteen tablets in the medicine cart and that Dr. Al-Shami had approved and modified the prescription to two capsules three times a day. *Id.*

At 8:30 a.m. on August 13, 2012, an officer noted that Mr. Collins was responsive, had no complaints, and took his medication (Filing No. 83-2 at 50). Five minutes later, it was noted that Mr. Collins was responsive but had complaints of shaking due to DTs from alcohol. *Id.* He was given a cup of water and was medicated with Librium, Thiamine (vitamin B1), and a multivitamin. *Id*. At 11:50 a.m., an officer noted that Mr. Collins was responsive, had no complaints, and ate

lunch. *Id.* Nurse Wheeler noted that Mr. Collins was responsive and voiced complaints at 3:00 p.m. *Id.* He was given a capsule of Librium for DTs, which was "ok'd" by Dr. Al-Shami. *Id.*

At 4:00 p.m. on August 13, 2012, Mr. Collins was examined by Nurse Wheeler (Filing No. 83-2 at 50, 68–70). She noted that Mr. Collins complained of DTs due to alcohol withdrawal and that he had been on medical observation since his arrest. *Id.* at 68. He complained of nausea, vomiting, and shaking in all extremities. Nurse Wheeler recorded his vital signs of blood pressure 186/90, pulse 94, respiration 20, temperature 98.2º, and O² saturation 97% on room air. *Id.* Mr. Collins reported a history of hypertension but had not taken medication for two to three years. *Id.* at 69. Mr. Collins admitted to being an alcoholic since 1999. He had a wound on his left shin, for which he was receiving care from a wound clinic. *Id.* His eyes were slightly yellow but he denied cirrhosis and hepatitis. *Id.* at 68.

Nurse Wheeler called Dr. Al-Shami on August 13, 2012, to report on her examination of Mr. Collins and his medical history. Dr. Al-Shami ordered his typical alcohol withdrawal treatment of Librium, Thiamine, and a multivitamin and encouraged Mr. Collins to eat and drink (Filing No. 83-1 at 2–3; Filing No. 83-2 at 68). In addition to the medication regimen, Mr. Collins was to be monitored for signs of withdrawal such as shaking, sweating, and changes in mental status (Filing No. 83-1 at 2). Mr. Collins was released from 15-minute observation and started the alcohol protocol (Filing No. 83-2 at 50, 59).

At 5:14 p.m. on August 13, 2012, Nurse Wheeler emailed jail staff to inform them that Mr. Collins was released from observation, had a wound on his left shin that had been treated by a wound care center, and was scheduled for an appointment at the wound care center on August 15, 2012 (Filing No. 83-2 at 59). She also informed jail staff that they did not yet have the proper materials to change the dressing on his wound, so Mr. Collins would need sponge baths rather than

showers, which Mr. Collins said he had been doing since May. *Id.* Nurse Wheeler noted that she gave Mr. Collins soap, a basin, and two towels for bathing and told him to notify officers when he needed a new uniform or towels. *Id.* At 8:56 p.m., an officer noted that he offered Mr. Collins a shower, but Mr. Collins showed the officer the wound on his leg that could not get wet (Filing No. 83-2 at 23). Medical staff provided Mr. Collins with supplies to wash in his cell. *Id.*

Following Mr. Collins's first full day at the Jail, on August 14, 2012, at 9:30 a.m., Nurse Wheeler called the Schneck Wound Center to reschedule Mr. Collins's August 15, 2012 morning appointment to the afternoon (Filing No 83-2 at 7). The nurse at the wound care center instructed Nurse Wheeler on how they were to treat Mr. Collins's leg wound. *Id.* At 7:23 p.m. on August 14, 2012, an officer noted that he overheard Mr. Collins talking in his cell even though he was alone. *Id.* at 8. The officer went to Mr. Collins's cell to speak with him, and Mr. Collins said he was waiting for his Librium. Mr. Collins knew where he was but acted indifferent about who the officer was and his surroundings. *Id.*

On August 15, 2012, at 11:21 a.m., Nurse Easterday noted that Mr. Collins appeared to be paranoid and delusional while receiving his medication. It took several minutes for Mr. Collins to take his medication (Filing No 83-2 at 9). Jail staff informed Nurse Easterday that Mr. Collins had been delusional earlier in the day. Nurse Easterday called Dr. Al-Shami, but he was not available, so she called Dr. Butler who was the next on-call doctor from ACH. Dr. Butler advised Nurse Easterday to discontinue Librium and give Mr. Collins a one-time dose of Haldol. Dr. Butler advised Nurse Easterday to send Mr. Collins to the emergency room for acute delirium if he did not improve in two hours. Mr. Collins was given a dose of Haldol, and Nurse Easterday continued to monitor him. *Id.* However, Mr. Collins did not improve with the Haldol. Within approximately an hour and a half, Dr. Al-Shami returned the missed telephone call from Nurse Easterday and told

her to send Mr. Collins to the emergency room since he had not improved with the Haldol.  *Id.* at 11.  Nurse Easterday noted that Mr. Collins was not compliant for her to obtain his vital signs.  Mr. Collins was taken to the emergency room at Schneck Medical Center for acute delusions around 1:00 p.m. on August 15, 2012.  *Id.* at 10–11.

Mark Guffey, M.D. ("Dr. Guffey") attended to Mr. Collins in the emergency room at Schneck Medical Center.  Mr. Collins was given an electrocardiogram ("ECG") and a full blood work-up (Filing No. 83-2 at 43–47).  His temperature, blood pressure, pulse, and respirations were within normal range (Filing No. 83-3 at 6–8).  His other vital signs were normal.  Mr. Collins did not report being in severe pain.  Dr. Guffey opined that Mr. Collins was not displaying an abnormal mental status.  *Id.*  Mr. Collins did have a low potassium level and a high lactic acid level.  *Id.* at 9.  His bilirubin also was high, which can be common in alcoholics.  *Id.* at 10.  Mr. Collins's ECG and chest x-ray were normal.  *Id.* at 11.  Dr. Guffey concluded that Mr. Collins did not have DTs because he was not tachycardic or diaphoretic, meaning his heart rate was not really high and his respiratory rate was not really high (Filing No. 83-3 at 13–14).  He also was not sweaty, shaky, or jittery.  *Id.*  Dr. Guffey also concluded that Mr. Collins was not confused and that Mr. Collins may be hallucinating, but Dr. Guffey thought Mr. Collins was "playing a little bit" based on his interaction with him.  *Id.* at 14–15.  Dr. Guffey saw no evidence of a severe or serious medical condition during his evaluation of Mr. Collins.  *Id.* at 22.

Dr. Guffey determined that Mr. Collins was in stable condition and could be released from the hospital.  *Id.* at 10–11.  When Dr. Guffey discharged Mr. Collins from the hospital, he did not advise the jail staff to continue Mr. Collins's Librium because he thought that Mr. Collins did not need it.  *Id.* at 21.

The next morning, August 16, 2012, at 5:35 a.m., Sgt. Barnes noted that he moved Mr. Collins into a padded cell for his safety, Mr. Collins was standing on the top bunk. He also gave Mr. Collins a bottled water to keep him hydrated.  Sgt. Barnes noted that Mr. Collins had been getting worse through the night and had not slept because of withdrawals (Filing No. 83-2 at 1). At 10:04 a.m., officers took Mr. Collins to the bathroom and noted that he had been able to drink two bottles of water since 6:00 a.m.  *Id.* at 2.

At 2:34 a.m. on August 17, 2012, Sgt. Barnes noted that Mr. Collins was "having bad DT's from alcohol," so he called Dr. Al-Shami, who ordered Librium to be administered immediately and again each day for ten days (Filing No. 83-2 at 3).  Sgt. Barnes noted that he could not get Mr. Collins's vital signs because of his physical state.  *Id.*

Later that morning, Dr. Al-Shami went to the Jail as part of his routine, weekly visit to check on his inmate patients (Filing No. 83-1 at 3).  Dr. Al-Shami examined Mr. Collins in his padded cell.  Nurse Easterday had not been able to obtain Mr. Collins's vital signs because of his mental state, but Dr. Al-Shami was able to feel Mr. Collins's pulse and listen to his heart, which were normal.  Dr. Al-Shami noted that Mr. Collins was jaundiced and had high bilirubin from his chronic alcohol abuse.  *Id.* at 3–4.  He reviewed Mr. Collins's emergency room records and jail medical records.  Dr. Al-Shami learned that Mr. Collins's emergency room lab work and ECG were normal.  He also discovered that Mr. Collins had low potassium and high lactic acid, so he ordered a potassium supplement and sodium bicarbonate to correct these problems.  *Id.*  Dr. Al-Shami's assessment of Mr. Collins was that he had DTs, hypokalemia (low potassium), and cirrhosis of the liver from alcoholism (Filing No. 83-2 at 42).  Because Mr. Collins had been at the hospital only two days earlier and his condition was unchanged from then, Dr. Al-Shami "saw no

reason to send Mr. Collins back to the hospital and thought he could be safely monitored at the jail by the nurses and officers." *Id.*; Filing No. 83-1 at 4.

Still, on August 17, 2012, Nurse Easterday noted at 3:51 p.m. that somebody at the wound care center returned the Jail's telephone call regarding Mr. Collins's leg wound. They would not be able to see Mr. Collins until his mental state and detoxification improved. Nurse Easterday called Dr. Al-Shami regarding the leg wound, and he advised her on how to tend to the wound. Nurse Easterday changed the dressing on the leg wound according to Dr. Al-Shami's orders (Filing No. 83-2 at 12; Filing No. 83-1 at 4).

During the next five days (August 18–22, 2012), no one from the Jail called Dr. Al-Shami about Mr. Collins (Filing No. 83-1 at 4). On August 19, 2012 at 2:49 a.m., officers tended to Mr. Collins's leg wound, cleaned his cell, provided a new mat and uniform, and gave him medications (Filing No. 83-2 at 13). At 1:33 p.m., an officer removed Mr. Collins's eyeglasses from his cell because Mr. Collins had broken off the ear piece from the glasses and was digging at his leg wound. *Id.* at 4. At 10:34 p.m., an officer gave Mr. Collins his night medications and noted that Mr. Collins thought he was in a room of a house and could not fix it. *Id.* at 16.

Approximately three hours later, on August 20, 2012 at 1:32 a.m., Mr. Collins was noted to be talking to himself about being somewhere else and two kids going around stealing things (Filing No. 83-2 at 14). At 5:30 a.m., Mr. Collins was responsive and drank some Kool-Aid. *Id.* at 31. At 6:30 a.m., it was noted that Mr. Collins did not eat his breakfast, but he did drink some milk and juice. *Id.* at 22. It was noted at 12:20 p.m. that Mr. Collins was responsive but also was talking to himself and that he refused to eat his lunch. *Id.* at 31. Then at 10:24 p.m., it was noted that Mr. Collins was responsive and walking around. *Id.* On August 21, 2012, at 6:00 a.m., an

officer noted that Mr. Collins was responsive and standing in a corner of his cell. *Id.* At 9:40 a.m., an officer noted that Mr. Collins was responsive, took his medications, and was talking. *Id.*

On August 22, 2012, pursuant to Nurse Easterday's direction, officers began 15-minute observations of Mr. Collins because of alcohol withdrawals. From 6:00 a.m. to 7:15 a.m., officers observed Mr. Collins every fifteen minutes and noted that he was laying on the floor naked (Filing No. 83-2 at 33). From 7:30 a.m. to 9:00 a.m., officers observed Mr. Collins every fifteen minutes and noted that he was laying on the floor. *Id.* At 9:00 a.m., Nurse Easterday noted that Mr. Collins was responsive, was talking, and took his medications. *Id.* at 31. At 9:15 a.m., officers noted that Mr. Collins was being checked on by Nurse Easterday. *Id.* at 33.

At 9:30 a.m., Mr. Collins was given two dextrose tablets because he had not been eating his food. He showered, had his leg wound dressed, received a new uniform, had his cell cleaned, and was given a new mat. Nurse Easterday noted that Mr. Collins was able to have some coherent conversation, that he was not steady in his gait, and that they would continue to monitor him (Filing No. 83-2 at 17, 31, 33). From 10:15 a.m. to 12:00 p.m., officers observed Mr. Collins every fifteen minutes and noted that he was either sitting down, sitting up, or laying on his mat. *Id.* at 33. At 12:00 p.m., Mr. Collins ate some of his lunch. *Id.* at 31, 33. From 12:30 p.m. to 5:00 p.m., officers observed Mr. Collins every fifteen minutes and noted that he was either laying down, sitting up, or trying to sit up. *Id.* at 33. At 5:00 p.m., Mr. Collins was observed eating dinner. *Id.* From 5:30 p.m. to 9:00 p.m., officers observed Mr. Collins every fifteen minutes and noted that he was either sitting, taking off his pants, trying to stand, or laying on his mat. *Id.*

At 9:40 p.m., an officer noted that Mr. Collins was responsive but mumbling, and he did not want to take his medications, so the officer would try again to give him his medications when another officer arrived (Filing No. 83-2 at 31). At 10:16 p.m., an officer noted that Mr. Collins

was responsive and that he took his medications with assistance from officers. *Id.* Mr. Collins was observed every fifteen minutes the remainder of the night and until 5:45 a.m. the next morning on August 23, 2012. Each time he was observed laying down. *Id.* at 32–33. As previously noted, no one from the Jail called Dr. Al-Shami about Mr. Collins from August 18 through August 22.

On August 23, 2012, from 7:00 a.m. to 9:00 a.m., officers observed Mr. Collins every fifteen minutes and noted that he was laying down. *Id.* at 32. At 9:15 a.m., he was sitting up and eating and drinking, and at 9:30 a.m. and 9:45 a.m. he was sitting up. *Id.* At approximately 10:00 a.m., Nurse Easterday administered morning medications to Mr. Collins and was able to get him to eat a few bites of a sandwich. *Id.* at 19, 31. At 10:08 a.m., Nurse Easterday noted that during the morning medication pass Mr. Collins's mental state appeared to have deteriorated. *Id.* Mr. Collins was not able to converse or maintain eye contact, and he was not able to stand or sit up without assistance. *Id.* at 19. Nurse Easterday called Dr. Al-Shami regarding Mr. Collins's overall condition and his mental state. Dr. Al-Shami directed Nurse Easterday to take Mr. Collins to the emergency room for lab work, fluids, and additional evaluation for possible liver failure. *Id.*; Filing No. 83-1 at 4. As directed by Dr. Al-Shami, Mr. Collins was taken to the hospital via ambulance, Filing No. 83-2 at 19, where it was determined that Mr. Collins was hypothermic with low blood pressure and respiratory failure (Filing No. 87-12 at 1). Dr. Al-Shami had no further involvement with Mr. Collins's medical care because Mr. Collins was admitted to the hospital and did not return to the Jail (Filing No. 83-1 at 4). Dr. Al-Shami returned to the Jail as part of his routine, weekly jail visit to check on inmate patients on August 24, 2012. *Id.*

During his confinement at the Jail, Mr. Collins received Librium every day from August 13 through August 15, 2012 and from August 17 through August 21, 2012 (Filing No. 83-2 at 64–65). He received Thiamine and a multivitamin every day from August 13 through August 22,

2012. *Id.* at 64. He received a potassium supplement and sodium bicarbonate every day from August 17 through August 23, 2012. *Id.* at 65. And he received Bactrim, an antibiotic, every day from August 18 through August 23, 2012. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "Although there are often disputed issues of fact affecting causation, summary judgment is appropriate when the undisputed material facts negate at least one element of the plaintiff's claim." *See In re Inlow Accident Litig.*, 2001 U.S. Dist. LEXIS 2747, at *62 (S.D. Ind. Feb. 7, 2001) (citation and quotation marks omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation

marks omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment."  *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.  DISCUSSION

Dr. Al-Shami and ACH have moved for summary judgment on Mr. Collins's claim under 42 U.S.C. § 1983 for inadequate medical care in violation of the Fourth and Fourteenth Amendments and his state law claim for medical negligence.  The Defendants argue that they are entitled to summary judgment because Dr. Al-Shami provided adequate medical care to Mr. Collins.  They assert that the medical testimony in evidence establishes that the care rendered by Dr. Al-Shami to Mr. Collins was reasonable and within the "standard of care."  Additionally, they assert that because Dr. Al-Shami was the only employee of ACH who was involved in providing care to Mr. Collins, ACH also is entitled to summary judgment.  They explain that the Court should consider the issue of inadequate medical care under the deliberate indifference standard under the Fourteenth Amendment, but also argue for summary judgment even if the objectively unreasonable standard applies.

Mr. Collins responds that the lower standard of objective unreasonableness (under the Fourth and Fourteenth Amendments) applies to this case of inadequate medical care, and he presents a different interpretation of the physicians' testimony in evidence, asserting that his interpretation precludes entry of summary judgment.  He argues that while the testimony of the physicians consistently explain that the course of treatment provided by Dr. Al-Shami was reasonable, additional monitoring was required for the medical care to be objectively reasonable.

The Court will first address the parties' legal dispute regarding whether the objectively unreasonable or deliberately indifferent standard applies.  Case law from the Seventh Circuit has established that "the protections of the Fourth Amendment apply at arrest and through the *Gerstein*[1] probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."  *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).  The objectively unreasonable standard applies under the Fourth Amendment; the deliberately indifferent standard applies under the Eighth Amendment; and the deliberately indifferent standard of the Eighth Amendment has been applied to claims of pretrial detainees by virtue of the Fourteenth Amendment's Due Process Clause.  *Id.*; *Williams v. Rodriguez*, 509 F.3d 392, 402–03 (7th Cir. 2007).  Mr. Collins argues that the recent decision of the Supreme Court in *Kingsley v. Hendrickson* has changed the standard under the Fourteenth Amendment to apply the Fourth Amendment's objectively unreasonable standard.

In *Kingsley*, a Fourteenth Amendment case, the Supreme Court considered the question of "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were subjectively aware that their use of force was unreasonable, or only that the officers' use of that force was objectively unreasonable."  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (U.S. 2015). The Supreme Court concluded that, where the officer's actions were intentional or deliberate (not accidental or negligent), the only issue the courts consider is the objective reasonableness of the amount of force used against the pretrial detainee, not the subjective state of mind of the officer. *Id.* at 2472–73.  Based on this decision, Mr. Collins argues that Fourteenth Amendment claims of inadequate medical care are now analyzed using the objectively unreasonable standard, not the

---

[1] The sole issue in a *Gerstein* hearing is whether there is probable cause to detain the arrestee pending further proceedings. See *Gerstein v. Pugh*, 420 U.S. 103 (1975)

heightened deliberately indifferent standard.  Mr. Collins position is well taken, however, the Court need not address whether *Kingsley* requires that the objectively unreasonable standard be used in this case because under either standard—deliberate indifference or objective unreasonableness—Mr. Collins's claims cannot survive summary judgment.[2]

Under the deliberately indifferent standard, "the plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994)).  The Seventh Circuit further explained that "we have articulated the test for deliberate indifference for Fourteenth Amendment purposes to be a conscious disregard of known or obvious dangers." *Id.* (citation and quotation marks omitted). Deliberate indifference occurs when the defendant "know[s] of and disregard[s] an excessive risk to inmate health." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

On the other hand, under the objectively unreasonable standard,

Four factors inform our determination of whether an officer's response to [the plaintiff's] medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns.  [The plaintiff] must also show that the defendants' conduct caused the harm of which she complains.

*Ortiz*, 656 F.3d at 530 (citations omitted).

While incarcerated, an inmate is not entitled to demand specific care and is not entitled to the best care possible, but he is entitled to reasonable measures to meet a substantial risk of serious harm. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

## A.      Mr. Collins's Claim of Inadequate Medical Care

---

[2] In their briefing the parties failed to explain Mr. Collins's status—arrestee or pretrial detainee—which also would affect the determination of what standard applies.

In his Complaint, Mr. Collins alleges that Dr. Al-Shami knew of his serious medical condition of alcohol withdrawals and DTs, which required treatment that could not be provided at the Jail.  He alleges that Dr. Al-Shami's failure to provide adequate medical treatment was objectively unreasonable and constituted deliberate indifference to his serious medical condition. Mr. Collins alleges that Dr. Al-Shami allowed his condition to deteriorate, which caused injuries that Mr. Collins otherwise would not have suffered (Filing No. 1 at 10–11).

Mr. Collins did not designate any evidence to support his allegation that the necessary treatment for alcohol withdrawal and DTs could not be provided in jail.  However, the Defendants did designate evidence showing that the Jail was equipped to successfully manage withdrawals and detoxification (Filing No. 83-1 at 2).  Specifically, in his affidavit, Dr. Al-Shami testified that many inmates experience drug or alcohol withdrawal and detoxification, this is something that is dealt with every day at many jails, and he has extensive experience treating such problems.  *Id*. Further, withdrawal and detoxification can be successfully managed in a jail setting.  *Id.*

In their summary judgment brief, the Defendants explain that the testimony from every physician involved with Mr. Collins's medical care (and the one reviewing expert witness) is that the treatment and care that Mr. Collins received from Dr. Al-Shami was reasonable and within the standard of care.  Dr. Guffey, the emergency room doctor who saw Mr. Collins on August 15, 2012, opined that a reasonable and appropriate course of treatment for alcohol withdrawal was Librium, Thiamine, a multivitamin, and increasing fluids (Filing No. 83-3 at 23, 26).  This is the course of treatment that Dr. Al-Shami prescribed for the jail nurses and staff to administer to Mr. Collins.

Dr. Al-Shami also designated evidence from Grant Olsen, M.D. ("Dr. Olsen"), one of the doctors who treated Mr. Collins during his hospitalization starting on August 23, 2012.  Dr. Olsen

opined that a medication regimen of Librium, Thiamine, and a multivitamin for mild alcohol withdrawal was very reasonable (Filing No. 83-4 at 5–6).  Dr. Olsen also opined that alcohol withdrawal can progress into DTs even when a patient is treated with Librium, *id.* at 8, and that alcohol withdrawal can progress into DTs even if a patient receives adequate medical care, *id.* at 10.  Dr. Olsen further opined that not everyone going through alcohol withdrawal needs to be hospitalized and that alcohol withdrawal can be appropriately managed in a non-hospital setting. *Id.* at 9–10.

Jonathan Light, M.D. ("Dr. Light"), the other doctor who treated Mr. Collins during his hospitalization starting on August 23, 2012, testified that the first line of treatment for alcohol withdrawal is a benzodiazepine, such as Librium (Filing No. 83-5 at 4).  He testified that the medications that Dr. Al-Shami ordered on August 13, 2012 for Mr. Collins were "certainly a reasonable choice of management for DTs."  *Id.* at 6.  Dr. Light opined that a medication regimen of Librium, Thiamine, and a multivitamin for a person at risk of developing DTs was "an appropriate place to start."  *Id.* at 8.  Dr. Light approved of Dr. Al-Shami's decision to again start Mr. Collins on Librium two days after Dr. Guffey saw Mr. Collins in the emergency room and had discontinued his use of Librium.  *Id.* at 9.  He also approved of Dr. Al-Shami's decision to start Mr. Collins on a potassium supplement.  *Id.*  Similar to Dr. Olsen's medical opinion, Dr. Light opined that, even with appropriate management, alcohol withdrawal can still develop into DTs. *Id.* at 10.  He further opined that, even after appropriate treatment is started for DTs, DTs still exist for a time until they are resolved.  *Id.*  During his deposition, Dr. Light clarified that he was not offering an opinion regarding the standard of care and the quality of medical care rendered in the Jail when he noted in his progress note that Mr. Collins's "altered mental status is likely delirium tremens which has been inadequately managed for the past week with oral Librium at jail," but

16

rather, he simply meant to note that despite being on Librium, Mr. Collins still developed DTs.  *Id.* at 10–11.

Dr. Al-Shami also designated evidence from Benton Hunter, M.D. ("Dr. Hunter"), an emergency room doctor with Indiana University Health.  Dr. Hunter reviewed the medical records of Mr. Collins from the Jail and hospital as well as the chronology of Mr. Collins's treatment at the Jail and hospital.  Dr. Hunter opined that Dr. Al-Shami's treatment of Mr. Collins was reasonable and within the standard of care (Filing No. 83-6 at 2).  He opined that Dr. Al-Shami's initial dosage of Librium when Mr. Collins arrived at the Jail was reasonable and that it was the same dosage that was prescribed on the bottle that Mr. Collins personally brought with him to the Jail.  Dr. Hunter also opined that Dr. Al-Shami's orders were reasonable and within the standard of care when Mr. Collins returned back to the Jail after his emergency room visit on August 15, 2012.  Dr. Hunter opined that it was reasonable for Dr. Al-Shami to not issue any additional orders after his assessment of Mr. Collins on August 17, 2012 until August 23, 2012 when he directed that Mr. Collins be taken to the hospital because the jail staff never contacted Dr. Al-Shami during that time period to give him any additional information regarding Mr. Collins.  *Id.*

Based upon this designated evidence, the Defendants assert that Dr. Al-Shami's treatment and care of Mr. Collins cannot be viewed as either objectively unreasonable or deliberately indifferent because his treatment was in line with what every other doctor testified he would have done to treat Mr. Collins's alcohol withdrawal and DTs, and because DTs could progressively worsen even with adequate medical care.  The designated evidence shows that Dr. Al-Shami prescribed the usual course of treatment, and the Jail nurses and staff were to administer that course of treatment to Mr. Collins.

In response to this evidence and argument, Mr. Collins asserts that Dr. Al-Shami was objectively unreasonable in providing care to Mr. Collins because adequate care of DTs and alcohol withdrawal required consistent, frequent monitoring of all vital signs, and such monitoring did not occur. Mr. Collins asserts that while the testimony of the physicians consistently explain that the course of treatment provided by Dr. Al-Shami was reasonable, additional monitoring was still required for the medical care to be objectively reasonable. To support his argument, Mr. Collins designated various portions of deposition testimony from the doctors who provided care to Mr. Collins as well as ACH's alcohol withdrawal protocol sheet.

The Court first addresses Mr. Collins's argument concerning the doctors' testimony. To begin, Mr. Collins challenges the credibility and weight of each doctors' testimony in various ways. However, at the summary judgment stage, the Court is not to evaluate the weight of the designated evidence but rather determine if there are genuine issues of triable fact, viewing the evidence in a light favorable to the non-moving party. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). Additionally, Mr. Collins challenges the ability of the treating physicians to provide expert testimony on the basis that they have either not visited the Jail or never worked as jail physicians, but at the same time, Mr. Collins argues that medical care should be provided according to the same standards of care regardless of the setting, citing *Allen v. Hinchman*, 20 N.E.3d 863, 870 (Ind. Ct. App. 2014).

Concerning Dr. Guffey's opinion, Mr. Collins explains that Dr. Guffey agreed with the other doctors that Librium, Thiamine, a multivitamin, and increasing fluids was a reasonable course of treatment. Then Mr. Collins adds that this course of treatment "presumed Mr. Collins would have his vital signs monitored, his behavior observed and reported to Dr. Al-Shami," citing to Dr. Guffey's deposition testimony at page 36, lines 1 through 3 (Filing No. 86 at 17). However,

a review of this designated evidence reveals that Dr. Guffey did not qualify the course of treatment

as being reasonable only if vital signs were monitored and reported to Dr. Al-Shami.  The cited

deposition testimony is as follows: "Q: You expected the jail nurse to follow your advice when

you spoke with her, did you not? A: I did." (Filing No. 87-2 at 11.)  Immediately before the cited

testimony, Dr. Guffey testified regarding Mr. Collins's condition when he presented at the

emergency room on August 15, 2012:

> Q:  During your evaluation of Collins, did you discover any evidence that he had a
> severe medical condition?
> A:  No.
> Q:  Or a serious medical condition?
> A:  No.
> Q:  Or even an objectively visible medical condition?
> A:  No.
> Q:  If you thought he had delirium tremens, what would you have done?
> A:  Admitted him to the hospital. Treated him, and admitted him to the hospital.

*Id.*  Mr. Collins designates no evidence to support his assertion that Dr. Guffey opined that Dr. Al-

Shami's course of treatment was reasonable only if it included monitoring Mr. Collins's vital signs.

Instead, the evidence shows that Dr. Guffey believed Dr. Al-Shami's course of treatment was

reasonable.

Mr. Collins next asserts that Dr. Olsen opined that "Mr. Collins should have had more

tests" and that "his serious condition should have been noted earlier," thereby implying, according

to Mr. Collins, that his vital signs should have been monitored as part of his treatment (Filing No.

86 at 17, 18.) For his assertion that Mr. Collins should have had more tests, Mr. Collins points to

page 79, lines 17 through 25 of Dr. Olsen's deposition:

> Q:  Okay.  Do you have an opinion as to whether Dr. Guffey should have admitted
> Collins to the hospital on the 15th?
> A:  My concern, once again, falls back to that lactic acid level being a little bit
> elevated.  In lieu of the additional information that comes later, I guess I had some
> concerns that there's additional workup that may have been required.  But in terms

of that particular point would have been necessary to admit particularly for a
concern of delirium tremens, I would have said no.

(Filing No. 87-3 at 22.)  Dr. Olsen's testimony that he "had some concerns that there's additional

workup that may have been required," was concerning the care rendered by Dr. Guffey at the

hospital before sending Mr. Collins back to the Jail, not any possible "additional workup" that

could have been completed by Dr. Al-Shami at the Jail.  This testimony does not support Mr.

Collins's assertion that Dr. Al-Shami should have conducted more tests or regularly monitored

vital signs.

For his assertion that Mr. Collins's serious condition should have been noted earlier, Mr.

Collins points to page 42, line 9, through page 43, line 24 of Dr. Olsen's deposition.  Here, Dr.

Olsen was asked whether Mr. Collins's condition could have been observed or detected earlier by

medical staff in the Jail.  Counsel clarified the question to mean that by just looking at Mr. Collins,

would his condition have been observable earlier than it was.  Dr. Olsen testified that it was a

difficult question to answer but that "perhaps things could have been noted earlier." (Filing No.

87-3 at 13.)  Immediately following this comment, Dr. Olsen explained that Mr. Collins's

condition could have developed over time or developed very quickly and dramatically, but that

timeframe would be very difficult to discern.  *Id.*  This evidence does not lead to Mr. Collins's

firm assertion that his medical condition should have been noted earlier, and importantly, it also

does not pertain to Dr. Al-Shami's care and treatment of Mr. Collins.  The statements concern the

observations that could have been made by the Jail nurses and officers who were tasked with

observing Mr. Collins each day.

Mr. Collins next turns to the testimony of Dr. Light and the medical record from Dr. Light

which noted Mr. Collins's "altered mental status is likely delirium tremens which has been

inadequately managed for the past week with oral Librium at jail." (Filing No. 86 at 19.)  The

Defendants designated evidence from Dr. Light's deposition where he clarified that this comment was not meant to offer an opinion regarding the standard of care and the quality of medical care rendered in the Jail. Instead, the comment was meant to point out that despite being on Librium, Mr. Collins still developed DTs. Mr. Collins did not designate any evidence to dispute this. He also did not designate any evidence from Dr. Light suggesting that Dr. Al-Shami's care and treatment fell below the standard of care. Mr. Collins points to deposition testimony of Dr. Light who believed if a jail doctor was not able to address a patient's medical condition at the jail, it was the doctor's responsibility to send the patient to the emergency room. Without citation to designated evidence, Mr. Collins asserts, "[u]nfortunately for Mr. Collins, who was near death, he did not get sent to the ER." *Id.* This comment ignores the evidence and fact that as soon as Dr. Al-Shami was informed by Nurse Easterday on August 23, 2012 that Mr. Collins's condition was worsening, Dr. Al-Shami ordered that Mr. Collins be taken to the hospital.

Regarding the testimony provided by Dr. Hunter that Dr. Al-Shami's treatment was reasonable and within the standard of care, Mr. Collins simply complains that his affidavit did not provide more detail and that he did not visit the jail or review the depositions of the treating physicians. Mr. Collins offers no evidence to dispute Dr. Hunter's opinion that Dr. Al-Shami's dosage of Librium and other orders were reasonable and within the standard of care and that there was no reason to issue new or additional orders because the Jail staff did not provide additional information to Dr. Al-Shami.

Concerning the testimony from the physicians in this case, Mr. Collins fails to show any factual dispute based upon the evidence that Dr. Al-Shami's care and treatment of Mr. Collins was objectively unreasonable, deliberately indifferent, or below the standard of care. What becomes clear from a review of the designated evidence is that, despite adequate medical treatment provided

by Dr. Al-Shami to Mr. Collins, he still developed DTs and other medical conditions that required treatment at a hospital, and as soon as the Jail nurse informed Dr. Al-Shami of Mr. Collins's deteriorating condition, Dr. Al-Shami ordered that Mr. Collins be taken to the hospital.

Mr. Collins also asserts that Dr. Al-Shami was objectively unreasonable in his care because he did not use or insist on the use of ACH's alcohol withdrawal protocol sheet, which he asserts required a regular and frequent monitoring of vital signs. Dr. Al-Shami, Nurse Easterday, and Nurse Wheeler each testified about the purpose of ACH's alcohol withdrawal protocol sheet. The protocol sheet was not a standard practice, a policy, or a required procedure for alcohol withdrawal treatment. Each testified that they did not complete a protocol sheet in their treatment of patients who suffered from alcohol withdrawal. Rather, each testified that the protocol sheets were used by jail officers as a guide to gather information when medical personnel were not available at the Jail. Consistent with the testimony provided by the medical personnel, Officer Charles Murphy testified that ACH's protocol sheets were for officers' use to gather information when a nurse was not available and that a protocol sheet sometimes would not be filled out because a nurse, instead of a jail officer, was evaluating the inmate patient (Filing No. 93-3 at 3). Officer William Drees similarly testified that ACH's protocol sheets were for jail officers to use when a nurse was not available (Filing No. 93-4 at 4).

ACH's protocol sheet for alcohol withdrawal specifically notes:

> These Protocols are designed to assist the staff in the gathering of information to be communicated to the medical staff. The Protocols are not intended to establish a standard of medical care and are not standing orders. All treatments must be ordered and approved by a Nurse Practitioner, Physician Assistant or Physician.

(Filing No. 87-6 at 1.) Dr. Al-Shami testified that the protocol sheets were used by jail officers when medical staff were not present to gather information to communicate to the medical staff who would then develop a treatment plan. Dr. Al-Shami did not use protocol sheets to develop

treatment plans for his patients (Filing No. 83-1 at 2).  Instead, he developed his treatment plans for his patients, including Mr. Collins, based on the patient's subjective complaints, the patient's objective symptoms, and his medical judgment.  *Id.* at 4.  Each time Dr. Al-Shami personally assessed Mr. Collins or was contacted by a jail nurse or officer, he ordered reasonable medical treatment to be provided to address the concerns brought to his attention.  On two occasions, the reasonable medical treatment that Dr. Al-Shami ordered was to take Mr. Collins to the hospital for further treatment.

To try to show a factual dispute regarding ACH's protocol sheet, Mr. Collins designated a protocol sheet from a prior incarceration of Mr. Collins in September 2010, and asserts that the 2010 protocol sheet shows that Dr. Al-Shami did actually use the protocol sheets as part of his standard practice (Filing No. 87-11 at 7–8).  However, this evidence supports the testimony and evidence of the Defendants that the jail officers used and completed the protocol sheets, and Dr. Al-Shami simply signed off on the sheets after review; Mr. Collins's designated protocol sheet from 2010 was completed by Officer Seth Pray and simply signed by Dr. Al-Shami.  (Compare handwriting of Officer Pray on Filing No. 87-11 at 7–8 with his handwriting on Filing No. 83-2 at 56.)  Mr. Collins did not designate any evidence about ACH's protocol sheet that creates a factual dispute about the purpose of the protocol sheet or about Dr. Al-Shami's treatment of Mr. Collins falling below the standard of care and being objectively unreasonable or deliberately indifferent.

The Court briefly addresses Mr. Collins's section of "Disputed Material Facts."  (Filing No. 86 at 5.)  Mr. Collins explains that he "challenges the allegations contained in the affidavit of Dr. Nadir Al-Shami contained in rhetorical Paragraphs 4, 5, 8, 9, and 11." *Id.*  But Mr. Collins does not explain what material facts in those paragraphs that he disputes.  He does not explain how or why he disputes any of the facts.  And importantly, Mr. Collins fails to designate any evidence

23

showing that there is a genuine dispute regarding any of the facts contained in paragraphs 4, 5, 8, 9, or 11 of Dr. Al-Shami's affidavit.  Mr. Collins's unspecified, unsupported "factual disputes" are deficient.

**B.      Mr. Collins's Claim of Medical Negligence and *Respondeat Superior***

Mr. Collins also asserted a state law claim of medical negligence against Dr. Al-Shami and alleged that ACH is liable for Dr. Al-Shami's actions under the doctrine of *respondeat superior*.

> To prevail in a medical malpractice action, the plaintiff must prove three elements: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure.

*McIntosh v. Cummins*, 759 N.E.2d 1180, 1183 (Ind. Ct. App. 2001) (citation and quotation marks omitted).  "Physicians are required to possess and exercise that degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful and prudent practitioner in the same class to which he belongs treating such maladies under the same or similar circumstances."  *Id.* at 1184. Where a physician defendant presents expert opinion that his conduct conformed to the requisite standard of care, the plaintiff claiming medical negligence must "present expert testimony establishing the standard of care and that [the physician defendant's] conduct fell below this standard."  *Marquis v. Battersby*, 443 N.E.2d 1202, 1203 (Ind. Ct. App. 1982).  If the plaintiff fails to designate expert opinion showing a conflict regarding the standard of care and the defendant's conduct falling below that standard, then there are "no genuine triable issues."  *Id.*

Dr. Al-Shami designated evidence from Dr. Hunter showing that he reviewed Mr. Collins's medical records and the course of treatment that Dr. Al-Shami provided.  Dr. Hunter opined that Dr. Al-Shami's treatment of Mr. Collins was reasonable and within the standard of care.  Dr. Al-Shami also pointed to the testimony of Dr. Guffey, Dr. Olsen, and Dr. Light, who opined that Dr. Al-Shami's treatment and orders were reasonable.

In response, Mr. Collins advances the same argument that he used for his federal claim of inadequate medical care; that Dr. Al-Shami's care was reasonable only if it included monitoring vital signs, and Mr. Collins's vital signs were not monitored regularly. He points to the deposition testimonies of Dr. Light and Dr. Olsen, which were discussed above. Dr. Al-Shami replies that Mr. Collins's implication from the deposition testimony, which is not supported by the actual testimony of the physicians, is not a substitute for expert medical testimony, and Mr. Collins cannot rely on speculation or conjecture, citing *Hayden v. Paragon Steakhouse*, 731 N.E.2d 456, 458 (Ind. Ct. App. 2004).

For the reasons discussed above during the analysis of the federal claim of inadequate medical care, the Court determines that the designated evidence does not show a genuine dispute of material fact regarding the standard of care and that Dr. Al-Shami's conduct was within that standard of care. Because Dr. Al-Shami is entitled to summary judgment on the state law medical negligence claim, so too is ACH under the doctrine of *respondeat superior*.

While Mr. Collins did not allege a Section 1983 federal claim for inadequate medical care against ACH in his Complaint, the parties briefly addressed this in their summary judgment papers. The Defendants correctly noted that Seventh Circuit case law is that ACH cannot be liable under Section 1983 for the actions of Dr. Al-Shami. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) ("doctrine of respondeat superior cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights"); *Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993) (same); *Iskander v. Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) ("a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights"). Therefore, Mr. Collins "must demonstrate that a

constitutional deprivation occurred as the result of an express policy or custom of [ACH]." *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002).

Instead of attempting to make this showing, Mr. Collins argues that he "should not be required to show that his inadequate care was caused by a policy of ACH.  It should be enough to show that agents of ACH (i.e., Dr. Al-Shami) provided Collins with constitutionally deficient medical care." (Filing No. 86 at 24.)  Mr. Collins relies on a suggestion found in *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014), that the Seventh Circuit should reevaluate its case law on the doctrine of *respondeat superior* and constitutional deprivations.  However, the current case law in the Seventh Circuit is clear, and Mr. Collins has not shown that ACH has an express policy or custom that leads to constitutional deprivations.  Thus, ACH is entitled to summary judgment on Mr. Collins's federal claim of inadequate medical care.

**C.    Motion to Strike Affidavit and Motion to Strike Surreply**

Mr. Collins includes a Motion to Strike within his response brief opposing the Defendants' summary judgment motion (Filing No. 86 at 4).  He requests that the Court strike the affidavit of Dr. Al-Shami on the bases that (1) the document is "suspicious" as the typeface on the signature page of the affidavit appears different from the other pages and transitions from paragraph 13 to paragraph 24, and (2) the affidavit provides additional information not covered in Dr. Al-Shami's deposition.

The Court first notes that the "court disfavors collateral motions—such as motions to strike—in the summary judgment process.  Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief."  Local Rule 56-1(i).

Mr. Collins provides no legal support for his Motion to Strike.  In response to the Motion to Strike, the Defendants explain that the typeface on the signature page of the affidavit appears

different from the other pages because it is a copy of the faxed signature page then made into a PDF. The Defendants explain that the transition from paragraph 13 on page 4 to paragraph 24 on page 5 is a typographical error that should have read paragraph 14, not 24. Further, Mr. Collins argues that Dr. Al-Shami's was evasive in the deposition, but he points to no contradictions in the deposition testimony that were contained in the affidavit. Having considered these arguments, and in light of Local Rule 56-1(i), the Court **DENIES** Mr. Collins's Motion to Strike the Affidavit of Dr. Al-Shami.

Mr. Collins filed a surreply brief following the Defendants' reply. The Defendants filed a Motion to Strike Surreply (Filing No. 95) on the sole basis that Mr. Collins filed his surreply two days late. However, the Defendants failed to take into consideration Rule 6(d)'s provision of three additional days to file the brief after service is made by electronic means under Rule 5(b)(2)(E). Therefore, the Court **DENIES** the Defendants' Motion to Strike Surreply. However, the Court considers only the material in Mr. Collins's surreply that concerns new evidence or objections raised in the Defendants' reply brief. *See* Local Rule 56-1(d).

## IV.  CONCLUSION

ACH and Dr. Al-Shami's Motion to Strike Plaintiff's Surreply (Filing No. 95) is **DENIED**. Mr. Collins failed to designate evidence to create a genuine issue of material fact that Dr. Al-Shami's care and treatment of Mr. Collins was objectively unreasonable, deliberately indifferent, or below the standard of care. He failed to show that ACH should be liable under the doctrine of *respondeat superior* or any other theory. The Defendants' Motion for Summary Judgment (Filing No. 81) is **GRANTED**, and Mr. Collins's action is **DISMISSED**.

All other pending motions (Filing No. 98 and Filing No. 109) are **DENIED** as Moot.

**SO ORDERED.**

Date: 8/31/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana


DISTRIBUTION:

James F. Bleeke
BLEEKE DILLON CRANDALL, P.C.
jim@bleekedilloncrandall.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Samuel M. Adams
MICHAEL K. SUTHERLIN & ASSOCIATES, P.C.
msutherlin@gmail.com

Michael K. Sutherlin
MICHAEL K. SUTHERLIN & ASSOCIATES, P.C.
msutherlin@gmail.com